Filed 4/26/22  P. v. Field CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C093041 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-157116B) |
| v. | |
| ERIC RAYMOND FIELD, | |
| Defendant and Appellant. | |

A jury convicted defendant Eric Raymond Field of residential burglary (Pen. Code, § 459), grand theft (*id.*, § 487, subd. (a)) and misdemeanor receiving stolen property (*id.*, § 496, subd. (a)).[1]  The jury found true that a nonaccomplice was present in the residence during the burglary.  (§ 667.5, subd. (c)(21).)  Defendant admitted three prior serious felony convictions (§ 667, subd. (a)(1)) and that he had served two prior

---

[1]    All undesignated statutory references are to the Penal Code.

1

prison terms (§ 667.5, subd. (b)).  Defendant also admitted three prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)

At the sentencing hearing, the trial court granted defendant's motion to strike two of the three prior strikes under section 1385 and *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.  The court sentenced defendant to 28 years four months in state prison, composed of the upper term of six years on the burglary count doubled under the three strikes law to 12 years, 8 months consecutive on the grand theft count doubled to 16 months, and five years for each of the three prior serious felonies, plus a concurrent term of 180 days for the misdemeanor receiving stolen property conviction.  Based on Senate Bill No. 136 (2019-2020 Reg. Sess.), the court dismissed the prior prison term enhancements.

On appeal, defendant contends the trial court erred (1) in denying his motion for a new trial based on newly discovered evidence; i.e., the negative results returned from his Google account in response to a search warrant; (2) in denying his motion to dismiss for failure to turn over exculpatory evidence under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), based on the same evidence; and (3) in responding to questions from the jury during deliberations.  Defendant also claims that the judgment should be reversed based on cumulative prejudice from these errors.

We will affirm.

## FACTUAL BACKGROUND

On December 17, 2017, Susan Barscz was having dinner with Loyce Smallwood at Smallwood's home in Auburn.  Smallwood's neighbor Kelley Davis lived across the street.  Barscz parked her car in Smallwood's driveway and left it unlocked.  Before going for a run, Barscz had taken off her jewelry and watch, which she left in a purse or shoulder bag in her car along with her iPad and wallet.  After dinner, Barscz decided to stay to watch a movie.

2

Earlier that day, Davis had taken her dog to the emergency veterinarian and noticed that Smallwood had left her garage door open when it was usually closed. Davis left Smallwood a voicemail that the door was open. When Davis returned after taking her dog to the veterinarian, she noticed the garage door was still open and there was a car with its windows rolled down "parked going the opposite direction" on the street. No one was in the car and the engine was off. Davis thought this was strange. After taking her dog inside her house, Davis got back in her car, drove past the parked car, and wrote down its license plate number. When she got home, Davis saw a shadow in Smallwood's driveway under the motion-activated light on her garage. It looked like someone was walking away from the garage. Davis called Smallwood several times before she finally answered, and Davis told her what was going on.

Smallwood and Barscz went outside and found the rear passenger side door of Barscz's car open. Barscz noticed that a number of items were missing, including an Anhk gold necklace, a pendant, a topaz and diamond necklace, a TAG Heuer wristwatch (worth $4,000) and a Garmin running watch—all of which were in her purse, and an iPad (worth $1,400) in a brown leather bag and a large flashlight. A set of car keys were also taken. The doors to all the cabinets in the garage were open. The door to Smallwood's car parked in the garage was not completely closed, but nothing appeared missing from the cabinets or Smallwood's car.

Deputy Sheriff Matthew Byers responded to Smallwood's home following a 911 call regarding a burglary and spoke to Barscz, who reported someone had gone through her car and stolen several items. Davis gave Byers the license plate number of the car she had written down. Byers ran the plate number and determined the car was a 2008 Nissan Sentra that belonged to Raelynn Fredlund.

On December 19, 2017, Detective Scott Byers found the car in Colfax. The car was parked three blocks from where an individual named Sean Tyler had reported his tools stolen.

3

About a week later, law enforcement officers searched defendant's bedroom at his parents' house. Audrey Hicks was in defendant's bedroom and defendant was in the bathroom when they arrived. An officer ordered defendant out of the bathroom and handcuffed him. In defendant's bedroom, the officers found Barscz's iPad, her car keys, the Garmin watch, the TAG Heuer watch, and her brown bag. Her purse was never recovered. They also found a bag of tools that belonged to Tyler and a number of cell phones, including defendant's phone. There were photos of Barscz's TAG Heuer watch, cameras and other electronic equipment on defendant's phone.

Defendant's father told the officers that he had found items that defendant could not afford in his room, which defendant's father took as a sign that defendant was stealing to support a drug habit. Defendant's father had seen defendant driving Fredlund's car on the day of the burglary.

Defendant admitted to the officers that he had borrowed the car on the morning of December 17, 2017, and stayed in the car all night. Defendant said that on the evening of December 18, 2017, he left the car in Colfax because he had heard it was reported stolen.

The officers arrested defendant and Hicks. While in the county jail, defendant had a telephone conversation with his father, which was recorded and played to the jury. In the course of the call, defendant's father said, "Well I -- I imagine it'll get reduced some. But there's one -- there's one issue, though. They found a couple things that they know were in the house that were found here in our house." Defendant said, "I know the things that came out of the garage. Yes, I know this." His father said, "Man. Well you'd be real smart to hang who was ever the fuck with you." Defendant said, "Yeah. I know. It'd be -- that'd be . . . ." Defendant's father said, "That'd be real smart," and defendant replied, "That'd be her."

4

## DISCUSSION

## I

## Jury Question

Defendant contends (1) the trial court erred in responding to a question from the jury during deliberations by referring jurors to certain of the instructions given, and (2) defense counsel rendered ineffective assistance by failing to object to the court's response. We conclude defendant forfeited the claim of error on appeal and defense counsel's decision to approve the court's proposed response was not ineffective assistance.

### *Background*

During deliberations the jury asked the following question: "For <u>any</u> of the charges, can defendant be convicted by either being the perpetrator or aiding and abetting?" The court discussed the question with counsel, noting that "[t]he word 'any' is underlined twice, so for any of the charges, that word [is] underlined twice."

Asked for comment, the prosecutor said, "The jury received three different instructions on aider and abetter [*sic*]. I think simply the answer should be yes." The court responded: "It seems when you read it at first glance, the simple answer is yes, but I have concerns with simply saying yes because of the way that the question is stated. [¶] Again, 'For any of the charges, can the defendant be convicted by either being the perpetrator or aiding and abetting?' [¶] If I say yes, I'm telling them, yes, you can convict the defendant. If they were to say, 'Can a person be convicted,' that would be a different story. But they're asking, in essence, for a directed verdict from the Court."

Defense counsel then stated: "I agree with the judge. And I think there's more than just simply answering yes. I think they need to -- my understanding is they need to all agree that if that's a theory of conviction that there's a unanimous agreement that that's the theory of conviction. It can't be ten people agree he's the perpetrator, two

5

people agree he's an aider and abetter [*sic*].  [¶]  My request would be to refer them to the instructions that deal with aider and abetter [*sic*]."

After further discussion among the court and counsel, the trial court then gave the following written response to the jury's question:  "Ladies and gentlemen of the jury, please refer to jury instructions 220, 400, 401, 1702, and 3550.  Please consider all of the jury instructions together as a whole as instructed."

### *Relevant Law*

"Section 1138 requires the trial court to provide the jury with 'any desired information "on any point of law arising in the case," ' and thereby creates a ' "mandatory" duty to clear up any instructional confusion expressed by the jury.' [Citation.]"  (*People v. Loza* (2012) 207 Cal.App.4th 332, 355 (*Loza*).)  "This does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.  [Citation.]  Indeed, comments diverging from the standard are often risky. [Citation.]  . . .  But a court must do more than figuratively throw up its hands and tell the jury it cannot help.  It must at least *consider* how it can best aid the jury.  It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given."  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97; see *People v Kopp* (2019) 38 Cal.App.5th 47, 65 (*Kopp*), review granted Nov. 13, 2019, S257844.)

### *Analysis—Forfeiture*

As an initial matter, the People argue that defendant forfeited this issue on appeal because his attorney did not object to the trial court's response to refer the jury to the various CALCRIM instructions.  (See *Kopp, supra,* 38 Cal.App.5th at pp. 65-68, review granted; *People v. Dykes* (2009) 46 Cal.4th 731, 802 (*Dykes*); *People v. Ross* (2007) 155 Cal.App.4th 1033, 1048-1049.)  The People further note that trial counsel expressly

agreed with the court's response, and by doing so, argue that defendant has waived any claim of error on appeal. (See *People v. Castaneda* (2011) 51 Cal.4th 1292, 1352; *People v. Harris* (2008) 43 Cal.4th 1269, 1317; *People v. Roldan* (2005) 35 Cal.4th 646, 729, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In response, defendant, argues "An objection in the trial court is not required in order for a defendant to bring an appellate challenge to a jury instruction that affected his substantial rights," citing section 1259. "The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259; see *People v. Carpenter* (1997) 15 Cal.4th 312, 381.)

Defendant contends that his substantial rights were affected because the trial court's failure to provide the jury any answer other than referring to instructions already given to them, may have allowed the jury to convict defendant even if it failed to find the prosecution proved all elements of the charges, in violation of defendant's federal due process rights. We are not persuaded.

Here, defendant does not challenge any specific jury instruction or complain that any of the instructions that the trial court referred to in its response to the jury were incorrect. Rather, defendant complains that the trial court's referral to these instructions was error because they were not sufficient to answer the jury's question.

Defendant relies on *People v Thompkins* (1987) 195 Cal.App.3d 244, in his contention that the trial court's response was inadequate, arguing that the trial court should have further questioned the jury on its "confusion." In *Thompkins*, the court admitted confusion about what the jury was asking, and as a result, found the trial court's limited response inadequate. "We admit to some difficulty understanding exactly what the jury was asking. If the trial judge shared our confusion, it may be he should have begun by asking the jury to clarify their questions. [¶] Assuming the questions were

7

clear, the succinct response given by the trial judge certainly has the virtue of simplicity, not an unimportant consideration in formulating instructions to a jury of laypersons. . . . The response, however, was inadequate." (*Id.* at pp. 250-251.)

But defendant himself confuses the jury's question. The jury in this case asked *whether it could apply* aiding and abetting principles *to any of the charged crimes*. The jury was not, as defendant posits, having difficulty understanding aiding and abetting principles themselves or *how to apply* those principles. Nor was the trial court confused about what the jury was asking: "It seems when you read it at first glance, the simple answer is yes, but I have concerns with simply saying yes because of the way that the question is stated. [¶] Again, 'For any of the charges, can the defendant be convicted by either being the perpetrator or aiding and abetting?' [¶] If I say yes, I'm telling them, yes, you can convict the defendant. If they were to say, 'Can a person be convicted,' that would be a different story."

Defendant cites *Loza* and *People v. Nero* (2010) 181 Cal.App.4th 504 (*Nero*), as examples of cases where appellate courts have held that the trial court erred in referring a jury back to a model instruction on aiding and abetting in response to jury questions.

In *Loza*, the defendant, Jeanne, was prosecuted under a theory of felony murder and the trial court instructed in part, with CALCRIM No. 400 and CALCRIM No. 401. "During deliberations, the jury sent the court a note that read as follows: 'Concerning aiding + abetting does the state of mind of the aider and abettor need/should be considered? If the person aids and abets because they are worried about an attack from the perp[e]trator does tha[t] make a difference when considering the degrees of murder[?]' " (*Loza, supra*, 207 Cal.App.4th at p. 349.) After discussion with counsel the court in *Loza* responded to the question by saying, " ' "You must apply the evidence to the law as you have been instructed." ' " (*Ibid.*)

On appeal Jeanne contended that the trial court erred in instructing the jury with the version of CALCRIM No. 400 that was in effect at the time, and that her attorney

rendered ineffective assistance in failing to object to the "equally guilty" language in CALCRIM No. 400. She also contended that the trial court erred in its response to two of the jury's questions, including the question about the state of mind of the aider and abettor. (*Loza, supra*, 207 Cal.App.4th at p. 348.) The *Loza* court ultimately held that by not objecting in the trial court, Jeanne had waived the issue of instructional error, but that her attorney was ineffective in failing to object or seek a modification to CALCRIM No. 400 and in failing to object to the court's response to the jury's questions concerning aiding and abetting. (*Loza*, at pp. 349-350, 355-356.)

In *Nero*, the defendant, Brown, was prosecuted as an aider and abettor to murder. During deliberations the jury asked the trial court whether it could find the aider and abettor, Brown, less culpable than the direct perpetrator, Nero. In response the trial court engaged in somewhat of a tortured discussion with the jurors and eventually reread CALJIC No. 3.00 to the jury, "including the statement in CALJIC No. 3.00 that '[e]ach principal . . . is equally guilty.' " (*Nero, supra*, 181 Cal.App.4th at p. 512.) The court in *Nero*, like other courts, found that CALJIC No. 3.00 and CALCRIM No. 400 can be misleading. "We believe that even in unexceptional circumstances CALJIC No. 3.00 and CALCRIM No. 400 can be misleading." (*Nero*, at p. 518; see also *People v Samaniego* (2009) 172 Cal.App.4th 1148, 1165 ["Consequently, CALCRIM No. 400's direction that '[a] person is *equally guilty* of the crime [of which the perpetrator is guilty] whether he or she committed it personally or aided and abetted the perpetrator who committed it' [citation], while generally correct in all but the most exceptional circumstances, is misleading here and should have been modified"].)

The focus of the jury in this case was different than that in *Loza* and *Nero*. Here, the jury was not concerned about the intent required for aiding and abetting, they were focused on whether the aiding and abetting principles could apply to any of the charges. Additionally, the version of CALCRIM No. 400 given in *Loza* has since changed and was not the version given to defendant's jury. The version of CALCRIM No. 400 given in

9

this case no longer includes the "equally guilty" language that caused confusion in *Loza* and *Nero*.[2]  Thus, there is no danger here of CALCRIM No. 400 being incomplete and misleading.  CALCRIM No. 400 is a correct and complete statement of the law, and defendant does not argue otherwise.

By referring the jury to the various CALCRIM instructions, the trial court reminded the jurors that a person may be guilty of a crime in two ways, one as a direct perpetrator and secondly as an aider and abettor.  CALCRIM No. 400 defined aiding and abetting.  CALCRIM No. 401 and CALCRIM No. 1702 reminded the jury of the intent required of an aider and abettor to burglary and CALCRIM No. 220 reiterated to the jury that the People were required to prove the defendant's guilty beyond a reasonable doubt.  Lastly, by referring the jury to CALCRIM No. 3550, the trial court reminded the jury of the requirement that their verdict must be unanimous:  "Your verdict on each count and any special findings must be unanimous."

These instructions were all correct statements of the law and unlike in *Loza* and *Nero*, the jury's question did not evince confusion over how to apply the aiding and abetting principles, but rather whether the aiding and abetting principles could be applied to any of the charges.  Thus, the trial court's referring the jury to CALCRIM Nos. 220, 400, 401, 1702, and 3550 was not inappropriate or insufficient, nor did it impact the requirement that the prosecution prove all elements of the charges.

In this circumstance we find that the original instructions themselves were full and complete, obviating the need for the trial court to elaborate further.  Having found such,

---

[2]     CALCRIM No. 400 as given stated:  "A person may be guilty of a crime in two ways.  One, he or she may have directly committed the crime.  I will call that person the perpetrator.  Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.  A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (*People v. Nilsson* (2015) 242 Cal.App.4th 1, 24-25 [April 2010 revision of CALCRIM No. 400 eliminated the word "equally"].)

we conclude that defendant has failed to prove that a substantial right was impacted by the court's response. Therefore, defendant forfeited any claim of error in the court's response to the jury's question by not objecting, but rather twice agreeing with the court's proposal to refer the jury to instructions given. (See *People v. Boyce* (2014) 59 Cal.4th 672, 699 ["Defendant forfeited his appellate challenge by expressly agreeing to the court's response"]; see also *Dykes, supra*, 46 Cal.4th at p. 802; *People v. Boyette* (2002) 29 Cal.4th 381, 430 (*Boyette*); *People v. Hughes* (2002) 27 Cal.4th 287, 402; *Kopp, supra*, 38 Cal.App.5th at pp. 65-66, review granted.)

### *Analysis—Ineffective Counsel*

Accordingly, we turn to defendant's alternative claim that defense counsel was constitutionally deficient in failing to object to the court's response. " ' "[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citation.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citation.]" (*Boyette, supra*, 29 Cal.4th at p. 430.)

" 'In determining whether counsel's performance was deficient, we exercise deferential scrutiny. [Citations.] The appellant must affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics. [Citation.] [¶] Our Supreme Court recently reiterated the obligations of appellate courts in reviewing claims of ineffective assistance of counsel: " ' "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of professional

11

assistance.' " [Citation.] "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.]' " [Citation.]' [Citation.]" (*Loza, supra*, 207 Cal.App.4th at p. 351.)

Defendant has failed to show that defense counsel's approval of the trial court's response to the jury's question was not a reasonable tactical decision. When the prosecutor proposed that the court simply answer "Yes," defense counsel sought to reinforce the court's concern that such an answer would amount to a directed verdict that defendant was guilty under one theory or another. Defense counsel also persuaded the court that the response to the jury's question should remind jurors that their decision must be unanimous to mitigate against a verdict where the jury did not agree on the factual basis of the verdict. This led the court to refer to one instruction that did not involve aider and abettor liability, to wit, CALCRIM No. 3550, the predeliberation instruction which states the jury's verdict "must be unanimous."

Lastly, by referring the jury to CALCRIM No. 400, the court encouraged jurors to review this language to clear up any confusion about the general application of direct or aiding and abetting liability to any and all crimes. Defense counsel's approval of the court's response to the jury question thus served to focus jurors on a correct statement of the law that answered their question, while reminding them that their verdict must be unanimous. There was no ineffective assistance of counsel.

## II

## Motion for New Trial

Defendant contends that the trial court erred and violated his right to due process when the court denied his motion for a new trial based on newly discovered evidence. We disagree.

12

*Background*

On August 26, 2019, following the trial and the jury's guilty verdict, newly discovered evidence was provided to defendant which consisted of a single page of a property record from the Placer County Sheriff's Office, which stated: "Warrant return document from google [*sic*], negative results." On September 23, 2019, the defense received from the prosecutor, the corresponding search warrant application and affidavit and a letter from Google, dated November 26, 2018, in apparent return to the warrant. The letter from Google stated: "Accompanying this letter is responsive information to the extent reasonably accessible from our system associated with the Google Account(s), ERICFIELD.E8892, FIELDSFINEST92, as specified in the Search Warrant. We have also included a signed Certificate of Authenticity which includes a list of hash values that correspond to each file contained in the production." The letter further stated Google "found no records for any Google account-holder(s) identified as ERICFIELD.E8892, as specified in your request. Therefore, we do not have documents responsive to your request."

On November 5, 2019, defendant filed a second motion for new trial under section 1181.[3] He argued, as he does here, that once these documents were provided, he learned for the first time, that a search warrant had been served on Google for information related to defendant's account usage and that pursuant to that warrant, Google had produced a single-page document entitled "Attachment A: Hash Values for Production Files (Google Ref. No. 2185272)." Defendant argues that had this document been turned over to the defense prior to trial, it could have been used to impeach Detective Byers who served the warrant on Google and testified at trial, and to challenge the prosecution's circumstantial evidence that defendant was at the scene at the time of the burglary. Defendant contends,

---

[3]     The first motion for new trial contended that newly discovered evidence showed that the trial judge was biased against defendant. The motion was denied.

"[c]ontrary to the trial court's finding, it is reasonably probable that the Goggle [*sic*] documents would render a different result on retrial."[4]

On December 10, 2019, the prosecutor approved another search warrant to Google requesting the same information to determine if Google had any evidence besides that which had already been produced.

On December 11, 2019, the prosecutor filed a declaration in opposition to the new trial motion stating that the detective who authored the search warrant informed the prosecutor that " '[t]he email account has been deleted and google [*sic*] is unable to provide any location data . . . .' "

Detective Byers stated in his declaration in opposition to the motion, that after reading the return from Google, he believed that Google had no responsive information and the accounts had been deleted. The detective further stated that his failure to complete the warrant return around the time it was received was an "oversight."

The prosecutor filed a supplemental declaration attaching as an exhibit Google's return to the December 10, 2019 search warrant. Google responded with a letter stating it had conducted a diligent search of the fieldsfinest92 account and again produced only the certification and the page listing hash values for the four fieldsfinest92 files.

The court conducted a hearing on defendant's motion for new trial, took the matter under submission, and denied the motion. The court stated that it "has not been provided with any information regarding the meaning of the document with the hash values that is the subject of this motion. I simply do not know what those numbers and letters mean."

On May 14, 2020, defendant filed a motion for reconsideration. Defendant supported the motion with a declaration from Mark Musial, a computer specialist with 40

---

[4] In his opening brief, defendant referred to "Goggle" some 75 times and used this appellation some 25 times in his reply brief. We understand all references to "Goggle" to mean Google.

14

years of micro-computer engineering experience. Musial stated a "hash value is a fingerprint for files" but a "hash value is not the file." "The contents of a file are processed through a cryptographic algorithm, and a unique numerical value -- the hash value -- is produced that identifies the contents of the file." "If the contents are modified in any way, the value of the hash will also change significantly." The prosecution did not file an opposition to the motion.

The trial court conducted a hearing on the motion for reconsideration. Defense counsel explained that hash values are a method of verifying the integrity of another file. The defense argued that the list of hash values was circumstantial evidence that Google sent the files. Defense counsel maintained that had they received notification of the negative results in the return to the warrant prior to trial, they could have been used in defendant's trial, and therefore a new trial was warranted.

The prosecutor agreed with the defense expert's characterization of a hash value as a fingerprint. The prosecutor told the court that in response to the second warrant, "the information that was received said there was no location information available for the dates and time periods requested." In response to the court's question, defense counsel agreed there was no location data in the files Google produced.

The court denied the motion based on the standard that "a new trial motion for late discovery is whether a different result would have been probable based on the information provided, not necessarily information that could have been subsequently developed from that evidence but whether [based on] the information itself, whether a different result would have been probable. [¶] And probable does not mean more likely than not. . . . It simply means a reasonable chance, which is more than an abstract possibility."

15

*Analysis*

Under section 1181, subdivision 8, a defendant may move for a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial."

" ' " 'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.] ' "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' " [Citation.]' [Citation.]" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108; see *People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*).)

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' [Citations.]" (*Delgado, supra*, 5 Cal.4th at p. 328.)

The Attorney General does not dispute that the negative results of the Google search warrant constitutes newly discovered evidence, but argues defendant failed to prove that this evidence would make a different result probable on retrial. The Attorney General asserts the search warrant response did not show that defendant was not at the scene of the burglary, but only showed that Google had no location data for defendant at the time of the burglary.

Defendant claims that "[w]hile the court interpreted the Goggle [*sic*] documents to mean that there was no information, it does not mean the jury would agree." The existence of hash values to authenticate documents indicated that Google did provide documents in response to the search warrant. The jury could conclude from the absence

16

of documents that the prosecutor was unsuccessful in placing defendant at the scene. Or the jury could find the detective's conclusions about the lack of evidence resulting from the Google search warrant "unconvincing" and could "use[ ] it to impeach his testimony and the investigation." Defendant posits that "the jury could have concluded Goggle [*sic*] did produce documents that [Detective] Byers either lost or inadvertently destroyed," which would "undermine[] the prosecutor's theory and [Detective] Byers' credibility." On reply, defendant distills his argument down to "the failure to turn over the documents hampered defense counsel's ability to effectively cross-examine [Detective] Byers and challenge his credibility."

To the extent that defendant contends that the newly discovered evidence could have been used for impeachment purposes, in *People v. Hall* (2010) 187 Cal.App.4th 282 (*Hall*), the court held that " '[a] new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence' or to contradict a witness of the opposing party." (*Id.* at p. 299; see also *People v. Shoals* (1992) 8 Cal.App.4th 475, 488 (*Shoals*).) Further, defendant's claim that the lack of location data in his Google accounts showed that Detective Byers lost or destroyed the documents produced is not only speculative but contradicted by the return to the second warrant which included production of the empty location data folder.

Nor would introduction of evidence of the absence of location data in defendant's Google account necessarily mean that the prosecutor's attempt at placing defendant at the scene was unsuccessful. We agree with the Attorney General that the absence of location data in his Google accounts establishes only that there is no evidence from that source about defendant's location on the night of the burglary. Defendant's admission that he had Fredlund's car, which Davis spotted on Smallwood's street at the time of burglary, is also evidence that defendant was at the scene. Defendant contends his admission on this point "was circumstantial evidence of his guilt and did not place him at the scene." Perhaps, but it creates a strong inference of his location at the scene.

Even assuming this evidence showed that the prosecution could not place defendant at the scene, a different result on retrial was not probable. As defendant points out, courts have held that a motion for a new trial should be granted where newly discovered evidence contradicts the "strongest evidence" against a defendant. (See, e.g., *Delgado, supra*, 5 Cal.4th at p. 329; *People v. Martinez* (1984) 36 Cal.3d 816, 823.) Defendant argues evidence that Google had no location data in the files in defendant's accounts meets this standard, because the evidence showed the prosecution's investigation failed to prove that defendant was at the scene or that location information obtained from Google showed defendant was not at the scene. We disagree that this evidence was sufficient to contradict the "strongest evidence" against defendant. (*Hall, supra*, 187 Cal.App.4th at pp. 298-299.) Overwhelming evidence showed that defendant drove Fredlund's car to Smallwood's street and burglarized Barscz's car. Besides defendant's admission that he had the car at the time of the burglary and defendant's father's testimony that he saw defendant driving Fredlund's car on the day of burglary, officers found Barscz's car keys, TAG Heuer watch, brown bag, Garmin watch, and iPad in defendant's bedroom. There was a photo of Barscz's TAG Heuer watch on defendant's phone. Defendant's father told police he saw items in defendant's room that defendant could not afford, which led his father to believe defendant was stealing to support a drug habit. In the recording of defendant's jailhouse phone conversation with his father, they discussed a plan to explain away the items found in defendant's bedroom by blaming Hicks.

The absence of location data in defendant's Google accounts " 'created at most a conflict with the *prima facie* case made out by the prosecution,' " and was insufficient to establish a probability of a different result on retrial. (*Shoals, supra*, 8 Cal.App.4th at p. 488; *People v. Jimenez* (2019) 32 Cal.App.5th 409, 423.) The trial court did not abuse its discretion or violate defendant's right to due process in denying the motion for a new

trial based on newly discovered evidence.[5]  (See *Hall, supra*, 187 Cal.App.4th at pp. 297, 300.)

III

*Brady* **Violation**

Both defendant's second motion for a new trial and motion for reconsideration also contended that the prosecution's failure to disclose the absence of location data in the return to the Google search warrant violated *Brady, supra*, 373 U.S. 83.

Under *Brady,* " ' "the prosecution must disclose material exculpatory evidence whether the defendant makes a specific request [citation], a general request, or none at all . . . ." [Citation.]  "For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness.  [Citations.]  Evidence is material if there is a reasonable probability its disclosure would have altered the trial result." '  [Citation.]  'A "reasonable probability" of a different result' does not mean 'the defendant would more likely than not have received a different verdict with the evidence,' but 'is . . . shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." '  [Citation.]  ' "Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies.  [Citations.]  Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is

---

[5]    The Attorney General also argues that defendant failed to carry his burden on the reasonable diligence factor, because the location data was accessible to him in his account.  The Attorney General proposes that defendant would have used the location data if it was favorable, but did not, indicating it was unfavorable.  This is speculation.  As it stands, there was no evidence presented that would account for the condition of defendant's Google files when the search warrant was served.  In any event, since we conclude that defendant has failed to show the evidence would render probable a different result on retrial, we need not reach this argument.

19

reversible without need for further harmless-error review." ' [Citation.]" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 668.)

Here there was no *Brady* violation because the return to the search warrant served on Google was not material evidence for much the same reasons that this newly discovered evidence did not warrant a new trial. The evidence was content neutral, showing only that defendant's Google accounts contained no location data. Defendant's argument that the evidence could be used to impeach Detective Byers with the suggestion that he lost or destroyed the location data was not only speculative, it was also contradicted by production of the location data file in the return to the second warrant, as defense counsel conceded.

Quite simply, it was not reasonably probable that the result of defendant's trial would be different if the jury were presented with evidence that a search warrant served on Google for location data produced negative results.

## IV

## Cumulative Error

Defendant contends that the judgment should be reversed based on the cumulative prejudice of the court's errors. However, we have determined that there was no error, so no prejudice could accumulate. (*People v. Vargas* (2020) 9 Cal.5th 793, 839.)

20

## DISPOSITION

The judgment is affirmed.

                                              /s/
                                          EARL, J.

We concur:

/s/
MAURO, Acting P. J.

/s/
RENNER, J.

21